## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

Thomas Richard Ollestad,                    No. 25-cv-3 (KMM/LIB)

      Plaintiff,

v.

      **ORDER**

City of Mora, Deputy Russell Coleman, *in his individual capacity*, Deputy Dylan Vangorden, *in his individual capacity*, and Deputy Jake Kleszky, *in his individual capacity*,

      Defendants.

This matter is before the Court on Defendants' Motion to Dismiss (Dkt. 14) and Plaintiff Thomas Richard Ollestad's "Motion to Strike Frivolous Defenses in Joint Answer to the . . . Complaint" ("Motion to Strike") (Dkt. 21). For the following reasons, the Court grants the Motion to Dismiss, denies as moot the Motion to Strike, and dismisses the Complaint with prejudice.

### BACKGROUND[1]

While this lawsuit relates to Mr. Ollestad's March 21, 2024 arrest at the Kanabec County Courthouse in Mora, Minnesota, the incident in question is only one skirmish in a

---

[1] The discussion in this Order involves facts alleged in the Complaint and reflected in video footage and an audio recording of the incident, as well as state court judicial orders cited to by the Complaint. To the extent the Court relies on them in this Order, it finds the extra-pleading materials are appropriate for consideration on a motion to dismiss. *See Porous Media Corp. v. Pall Corp*., 186 F.3d 1077, 1079 (8th Cir. 1999) (explaining that courts can consider materials attached to or embraced by the pleadings, matters of public

*(footnote continued on following page)*

long running series of issues between Ollestad and the Kanabec County courts. As alleged by Mr. Ollestad, these issues are "a result of [K]anabec County elected officials taking his two children unlawfully and illegally." (Dkt. 1 ¶ 12.) As a result, Ollestad suffers from "mental anguish disabilities," including depression, anxiety, panic attacks, and "adjustment disorder." (Dkt 1 at 2 ¶ 3,[2] 4 ¶ 12.)

In November 2023, the Kanabec County courts issued an administrative order limiting Mr. Ollestad's use of the courthouse and his interaction with court staff due to him being "repeatedly disrespectful, demanding, profane, and abusive in his communication towards court administration staff . . . ." (Dkt. 1-1 at 1 ¶ 1.) Nonetheless, Ollestad "continued to violate the [November 2023 order] by repeatedly engaging in unacceptable behavior, abusive [sic], and indirectly threatening [sic] toward court staff." (Dkt. 1-1 at 2 ¶ 4.) This included violating a previous, public-wide administrative order against recording court staff. (Dkt. 1-1 at 3 ¶ 8.) Neither of the administrative orders stopped Ollestad's conduct. (*See* Dkt. 1-1 at 2–7 ¶¶ 4–19.)

Due to Ollestad's continued behavior, the Kanabec County courts issued a second administrative order on March 20, 2024 further restricting Mr. Ollestad's ability to

---

record, and other specified categories of information). Specifically, the Court credits the facts in the Complaint to the extent they do not contract the video and audio recordings. *See Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019) ("Nor need we adopt the plaintiff's version of the facts if they are 'blatantly contradicted' by video evidence.") (quoting *Boude v. City of Raymore*, 855 F.3d 930, 933 (8th Cir. 2017)) (cleaned up).

[2] The Complaint contains consecutive paragraphs sharing the number 3. The first (on page 2 of the Complaint) includes the allegations of Mr. Ollestad's alleged psychological harm, while the second (on page 3 of the Complaint) concerns this Court's subject matter jurisdiction. The Court includes in its citations to the Complaint the specific page numbers for clarification.

interact with the courts. Among other restrictions, the March 2024 administrative order prohibited Ollestad from entering certain portions of the courthouse and banned him from using "Public Access Terminals, the Self-Help Access Terminals" or the courthouse's law library. (Dkt. 1-1 at 8 ¶ 3.)

Despite these administrative orders, Mr. Ollestad returned to the courthouse on March 21, 2024, entered the law library, and began to use its computers to print out files related to his child custody case. Ollestad describes that he was sitting there "peacefully." (Dkt. 1 at 7, 8 ¶ 17.) A short time later, Defendants Kanabec County Sheriff's Deputies Russell Coleman and Jake Kleszky approached Ollestad at the computer terminal and stood behind him. Defendant Deputy Dylan VanGorden (collectively, "the Deputies") joined the officers approximately a minute later. Ollestad alleges that he did not see or speak to anyone in the courthouse before the Deputies arrived and describes them as wearing body armor and being armed with a baton, taser, firearm, and lapel microphone.

Based on the transcript of the incident,[3] the Deputies then proceed to repeatedly tell Ollestad that he needs to leave the courthouse, totaling at least ten times.[4] Ollestad refused each demand, often in profane terms. Around this point, Ollestad appeared to stand up at the computer terminal after which the Deputies rolled the chair he had been

---

[3] The audio transcript and the video footage appear to come from two different sources, with the audio coming from a body-worn microphone and the video sourced from a security camera in the courthouse. While the video contains specific time stamps, the audio transcript contains no such markers. The Court accordingly approximates their synchronicity based on when the arrest can be seen and heard made.

[4] Because all three Deputies were involved in the arrest and neither the Complaint nor the exhibits clearly distinguish between them, the Court refers to them collectively as "the Deputies" unless stated otherwise.

seated in away from him. When the Deputies told Ollestad that they would take him to jail for disorderly conduct if he did not leave, Ollestad responded, "I don't give a fuck." (Dkt. 13-1 at 19; Dkt. 1 at 8.) The Deputies again told him to leave and Ollestad refused.

The Deputies then told Ollestad to "[g]o to the ground." (Dkt. 13-1 at 19.) The Deputies stepped in toward Ollestad and two of them grabbed his arms. As they spun Ollestad away from the computer terminal, one Deputy pulled Ollestad's right arm and stepped in front of his right leg as the two Deputies then pushed Ollestad down to one knee and then into a prone position. The Deputies grabbed Ollestad's arms and handcuffed him while he remained on his stomach. While getting handcuffed, Ollestad complained that his "fucking shoulder is broken" and he can be heard in the audio groaning at least once. (Dkt. 1 at 12 ¶ 27; Dkt. 13-1 at 19.) A Deputy appears to have responded, "It's not." (Dkt. 13-1 at 19.) Ollestad alleges in his Complaint that he experienced "unbearable pain" when he was handcuffed. (Dkt. 1 at 9.) Ollestad attached to his Complaint a photo of his bare left shoulder appearing to show a protruding collarbone. (Dkt. 1 at 13.)

The Deputies appeared to pat Ollestad down while he was in the prone position and removed his backpack. In response to an inaudible comment by Ollestad, another Deputy stated "No, violation – continual violation of court orders." (Dkt. 13-1 at 19.) Ollestad continued to swear and deny he had done anything wrong. The Deputies then pulled Ollestad back to his feet by his left shoulder. About the time Ollestad returned to his feet, one Deputy asked him which shoulder was hurting. Ollestad responded that it was his right arm. The Deputy then stated, "well this is your left arm," which Ollestad

acknowledged. The time between the Deputies grabbing Ollestad from the computer terminal to him returning to his feet was approximately 45 seconds in duration.

One Deputy then led Ollestad out of the view of the camera by Ollestad's left arm, with the other two Deputies to Ollestad's side and back.[5] As the Deputies led Ollestad outside, Ollestad told one "You're pretty fucking stupid" and "I think you're a fucking idiot." (*See* Dkt. 13-1 at 20.) When the Deputies again informed him that he was being arrested for disorderly conduct, he questioned why "printing paper" was disorderly conduct when it was his "constitutional right" to do so. (*See* Dkt. 13-1 at 21.) The Deputies retorted that such an allegation was due to him being "loud, boisterous, and using profanities in a public place."[6] Ollestad stated that he was not using profanities, to which a Deputy responded, "You were, I think you said a pig fucker fucking faggot." (*Id.*) "Ok cool," Ollestad replied. (*Id.*) Upon questioning, Ollestad disclosed that he had a pocketknife on him. The Deputies continued to have an inaudible conversation with Ollestad and eventually one Deputy stated that he returned the knife to Ollestad's backpack. The entire recorded interaction between Mr. Ollestad and the Deputies lasted about six minutes.

Ollestad then underwent a medical screening which stated that he experienced shoulder pain, depression, and anxiety, but upon observation did not show signs of a need for immediate medical care or of a mental illness.

---

[5] The video footage concludes at this point.

[6] This quote is not included in the transcript provided by Defendants but can be heard in the audio starting at the 4 minute and 59 second mark.

Mr. Ollestad filed his Complaint on January 2, 2025 asserting seven claims: (1) a 42 U.S.C. § 1983 claim against the Deputies for excessive force in violation of the Fourth Amendment; (2) a § 1983 claim against the Deputies for "Deliberate Indifference to Medical Need/Excessive Force/Failure to Provide Medical Care"; (3) a claim against all Defendants for violations of the Americans with Disabilities Act; (4) a claim against the City of Mora[7] for violations of the Rehabilitation Act; (5) a § 1983 claim against all Defendants for failure to train and supervise in violation of the Fourth Amendment; (6) a § 1983 claim against the City of Mora for "Unconstitutional Custom/Practice, Failure to Train, Failure to Supervise"; and (7) a § 1983 claim against the Deputies for violations of his substantive due process rights. The thrust of Ollestad's claims is that the Deputies knew or should have known of both his shoulder injury and his mental health issues, causing his arrest and their use of force to be unreasonable. He also argues that the March 2024 administrative order is illegal and void. He seeks declaratory relief, multiple types of injunctive relief, damages, and a written apology from each Defendant.

On April 8, 2025, Defendants filed a Joint Answer to the Complaint (Dkt. 13) and the instant Motion to Dismiss (Dkt. 14). Ollestad did not file a response, but filed a

---

[7] The City of Mora is likely the wrong defendant for Ollestad's claims. While the arrest happened in the City of Mora, it occurred in the Kanabec County Courthouse by Kanabec County Sheriff's Deputies acting in reliance on a county court order. Ollestad alleges that the Deputies are "duly appointed and sworn" police officers for the City of Mora, but that is contradicted by his Complaint and the documents embraced by it, which clearly indicate the Deputies' connection to the county. Regardless of the appropriateness of the City's inclusion in this action, this Complaint is dismissed in full with prejudice for failure to state a claim.

Motion to Strike, raising what he sees as issues with Defendants' Answer. (Dkt. 21.) He also filed additional exhibits. (Dkt. 22.) Defendants did not file a Reply.

## DISCUSSION

## I.    Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require the inclusion of "detailed factual allegations" in a pleading, but the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In applying this standard, the Court must assume the facts in the Complaint to be true and take all reasonable inferences from those facts in the light most favorable to the plaintiff. *Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019). But the Court need not accept as true any wholly conclusory allegations or legal conclusions that the plaintiff draws from the facts alleged. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).

## II.    Analysis

### A. *Rooker-Feldman*

As a starting point, any challenge Ollestad makes here to the validity of the March 2024 administrative order underlying his arrest is barred by the *Rooker-Feldman* doctrine. "Under *Rooker-Feldman*, federal district courts lack jurisdiction over cases

brought by state-court losers complaining of injuries caused by state court judgments rendered before the federal court proceedings commenced and inviting district court review and rejection of those judgments." *Miller v. Macone*, No. 25-sc-1396 (PJS/JFD), 2025 WL 1249692, at *3 (D. Minn. Apr. 30, 2025) (quoting *Robins v. Ritchie*, 631 F.3d 919, 925 (8th Cir. 2011)) (quotation marks omitted); *see Sutter & Gillham PLLC v. Henry*, 146 F.4th 699, 702 (8th Cir. 2025) (explaining the narrow scope of the doctrine).

Although it is not entirely clear that Mr. Ollestad asserts any claims directly challenging the propriety of the March 2024 administrative order, he certainly questions its validity in his Complaint. For example, Mr. Ollestad invites this Court to review and reject the March 2024 administrative order. Specifically, he alleges that the administrative order is "illegal" and is "void on its face" (Dkt. 1 at 5 ¶ 14), and he broadly asks for declaratory and injunctive relief (Dkt. 1 at 36). To the extent his Complaint seeks a declaration that the administrative order is illegal or void, such a claim is barred by the *Rooker-Feldman* doctrine.

**B. Excessive Force**

Ollestad's first claim is that the Deputies used excessive force when arresting him on March 21, 2024. Ollestad asserts that the Deputies used "unprovoked," "unwarranted," and "unreasonable" force in bringing him to the ground, holding them there, and keeping him handcuffed—especially considering his injured shoulder—

constituting a constitutional violation.[8] (Dkt. 1 at 20–23.) The Deputies argue they are

protected by qualified immunity and Ollestad has not alleged a constitutional violation.

The Deputies are correct.

      To plead a § 1983 action, a plaintiff must allege that a person acting under color of

state law violated his or her constitutional rights. 42 U.S.C. § 1983; *Iqbal*, 556 U.S. at

676. However, government officials have qualified immunity from § 1983 claims. As a

result, plaintiffs must allege that the defendant engaged in conduct that violated a

constitutional right and that, at the time of the alleged violation, the right was clearly

established. *E.g.*, *Ryno v. City of Waynesville*, 58 F.4th 995, 1004 (8th Cir. 2023). The

Fourth Amendment prohibits law enforcement from effecting unreasonable seizures. U.S.

Const. amend. IV. "An officer's use of force violates the Fourth Amendment if it was

'objectively unreasonable.'" *Pollreis v. Marzolf*, 9 F.4th 737, 747 (8th Cir. 2021) (citing

*Graham v. Connor*, 490 U.S. 386, 394–96 (1989)). Reasonableness is based on the

factual circumstances of each case, including "the severity of the crime at issue, whether

the suspect poses an immediate threat to the safety of the officers and whether he is

actively resisting arrest or attempting to evade arrest . . . ." *Id.* (quoting *Graham*, 490 U.S.

at 396). However, any use of force analysis starts from a baseline that officers are

allowed "to use some degree of physical coercion" to effect an arrest. *Graham*, 490 U.S.

at 396.

---

[8] Ollestad greatly dramatizes these events in his Complaint, which the Court
largely ignores as inconsistent with the video footage. *See Waters*, 921 F.3d at 725, 734
(8th Cir. 2019) ("We need not accept as true a plaintiff's conclusory allegations or legal
conclusions drawn from the facts").

Mr. Ollestad did not allege a Fourth Amendment violation here because, even accepting the allegations in the Complaint as true and giving him the benefit of all reasonable inferences from those facts, the degree of force used by the Deputies was reasonable. Before the Deputies used any force against him, they repeatedly instructed Mr. Ollestad that he needed to leave the courthouse and warned him that he would be arrested if he failed to do so. Mr. Ollestad not only refused to comply with these commands, but he also made clear that he had no intention of doing so, telling the Deputies "I don't give a fuck" when they explained that he was not allowed in the building based on the March 2024 administrative order. Only then did the Deputies resort to force. And even then, the Deputies brought Ollestad to the ground using only the force necessary to ensure his compliance and effect the arrest. The Deputies did not strike Mr. Ollestad or otherwise use force beyond what the situation and Ollestad's non-compliance demanded.

While Ollestad argues that that his physical condition makes the Deputies' actions unreasonable, he alleges no facts to indicate that they were aware of his injury before the arrest began. Not once during the initial colloquy between the Deputies and Ollestad did he alert the Deputies to any injuries. As alleged in his Complaint, Ollestad complained of his shoulder injury only once the Deputies had him on the ground and were in the process of handcuffing him. (Dkt. 1 at 12 ¶ 27.) From there, the video footage shows that the Deputies restrained from using any force against his injured right shoulder, instead using his uninjured left arm to lift him off the ground and lead him out of the courthouse. Mr. Ollestad alleges that his arrest caused significant pain and additional shoulder injuries.

But "when an officer exerts objectively reasonable force which results in the aggravation of a pre-existing injury unknown to the officer, such an injury is not sufficient to indicate excessive force." *Copeland v. Locke*, 613 F.3d 875, 882 (8th Cir. 2010)) (citing *Cavataio v. City of Bella Villa*, 570 F.3d 1015, 1020 (8th Cir. 2009)). Because the arrest appears to be a standard interaction with a non-compliant person and the Deputies were not on notice of any injuries, no constitutional violation occurred. Accordingly, Ollestad's first claim is dismissed for failure to state a claim.

### C. Deliberate Indifference

Next, Ollestad alleges that the Deputies were deliberately indifferent to his need for medical care, thereby violating the Fourth Amendment.[9] Specifically, Ollestad claims that the Deputies were aware of his shoulder pain and mental health issues yet failed to inform the Kanabec County Jail upon his transfer there, causing a prolonged period of suffering. (Dkt. 1 at 23–26 ¶¶ 42–56.) To assert a claim for deliberate indifference, a plaintiff must show that "(1) he suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it." *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004); *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.

---

[9] Ollestad asserts this claim as a Fourth Amendment violation, but his status as a pretrial detainee at the time of the alleged violation means his claim arises from the Fourteenth Amendment, which is how the Court accordingly analyzes it. *See Humes v. Jones*, 109 F.4th 1112, 1116 (8th Cir. 2024) (noting that the Fourteenth Amendment extends protection against deliberate indifference to pretrial detainees); *Solomon v. Petray*, 795 F.3d 777 (8th Cir. 2015) (liberally construing pro se complaints requires district courts to consider the complaint "in a way that permits the layperson's claim to be considered within the proper legal framework") (quoting *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004)).

1997). Pleading a claim for deliberate indifference is a high bar, requiring a showing of "more than negligence, more even than gross negligence" in disregarding the detainee's care. *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)).

Even assuming Ollestad had an objectively serious medical need at the time of the arrest, he cannot plausibly allege that the Deputies knew—nevertheless disregarded—these conditions. Regarding his shoulder, Ollestad alleges no facts to support that the Deputies knew of his shoulder injury before the arrest takes place. Even after he informed the Deputies of his shoulder condition, he contradicted himself about which shoulder was hurt and ceased complaining about any injury shortly after he was placed in handcuffs. His own allegations and the materials embraced by his Complaint therefore suggest that it was far from clear whether he was actually in pain and if so, how severe it was. As to his mental health concerns, Ollestad does not make any allegations that the Deputies knew of these issues. In sum, there is nothing in the materials properly before the Court that suggests any Defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . dr[e]w the inference." *Jones v. Faulkner Cnty.*, 131 F.4th 869, 874 (8th Cir. 2025) (discussing the subjective component of a deliberate-indifference claim and quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) These allegations are insufficient to plead that the Deputies knew of his medical needs and were deliberately indifferent to them, and the Court dismisses his second claim.

### D. Americans with Disabilities Act

Ollestad next claims that Defendants' conduct violated the Americans with Disabilities Act ("ADA"). Ollestad asserts that he was unable to comply with the Deputies' commands due to his apparent disabilities, and that Defendants had a duty to provide him with reasonable accommodation in connection with his arrest. To sufficiently assert an ADA claim, Mr. Ollestad must show "that he is a qualified individual with a disability denied participation in, or the benefits of, the services, programs, or activities of a public entity because of his disability" and that he was denied a reasonable accommodation for that disability. *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998); *Holmes v. Minn. DOC*, No. 23-cv-2969 (PJS/DJF), 2024 WL 5318972, at *6 (D. Minn. Dec. 6, 2024) ("When a plaintiff makes a claim of Title II discrimination based on a failure to accommodate, he must show that: (1) he is a qualified individual with a disability; and (2) the public entity failed to make reasonable accommodations where necessary to give meaningful access to programs or benefits."), *R&R adopted*, 2025 WL 71607 (D. Minn. Jan. 10, 2025) (quotations omitted). The plaintiff must show not only that he was denied a reasonable accommodation, but that the discrimination was either intentional or caused by deliberate indifference. *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011). In the arrest context, the Eighth Circuit has clarified that the "inquiry into whether officers reasonably accommodated the individual is 'highly fact-specific and varies depending on the circumstances of each case, including the exigent circumstances presented by criminal activity and safety concerns' . . . ." *De Boise*

*v. Taser Int'l, Inc.*, 760 F.3d 892, 899 (8th Cir. 2014) (quoting *Bahl v. Cnty. of Ramsey*, 695 F.3d 778, 784–85 (8th Cir. 2012)).

For the reasons already addressed above, Ollestad does not plausibly allege that any disability discrimination he faced was intentional or a result of deliberate indifference on the part of the Deputies. There was little or no notice provided to the Deputies of Mr. Ollestad's physical or mental health issues and his actions throughout the arrest contradict his claims of their severity. Nor did he ever make a request for an accommodation.

Ollestad, however, argues that the Deputies violated the ADA by carrying out a wrongful arrest, a theory in which "law enforcement officers may be liable under the ADA . . . if the officers unreasonably mistake an innocent, disability-related behavior for criminal conduct." *Roberts v. City of Omaha*, 723 F.3d 966, 973 (8th Cir. 2013) (citing *Jackson v. Inhabitants of the Town of Sanford*, Civ. No. 94–12–P–H, 1994 WL 589617, at *1, 6 (D. Me. Sept. 23, 1994)). Even assuming Ollestad has sufficiently shown that he is disabled—which he has not—his ADA claim fails for two additional reasons. First, the wrongful arrest theory pursued here has never been recognized by the Supreme Court or the Eighth Circuit[10] and the Court lacks any binding authority to apply to the issue. In fact, the Court can find only one district court within the Eighth Circuit to ever have

---

[10] The Eighth Circuit has discussed this wrongful arrest theory in *Roberts*, cited above, but failed to formally adopt it as a cause of action under the ADA or Rehabilitation Act. *See Roberts*, 723 F.3d at 973 ("Even assuming *Jackson*[, 1994 WL 589617]—a district court opinion from another circuit—is consistent with the law in our circuit, *Jackson* did not clearly establish the officers' duties in the circumstances of this case . . . .").

considered such an argument, which applied only persuasive authority from other circuits in denying the plaintiff's claim. *See Baca v. City of Parkville*, No. 5:19-cv-06057-RK, 2021 WL 5702163, at *3–5 (W.D. Mo. Dec. 1, 2021).

But even assuming this claim is available to Ollestad, he has not plausibly alleged that his arrest was due to an unreasonable mistake on the part of the Deputies or that he was arrested "based on lawful conduct related to his disability." *Id.* at *4. As an initial matter, Ollestad has not alleged in any way that his disability caused him to show up at the Kanabec County Courthouse in violation of the state court's March 2024 administrative order. Nor does he argue that his disabilities caused his profane comments to the Deputies. Instead, Ollestad claims that his disabilities caused him to not follow commands, to be confused and frantic upon arrest, and caused him to be unable to "speak for himself . . . ." (Dkt. 1 at 27.) But the audio recording and Mr. Ollestad's own Complaint demonstrate that Mr. Ollestad was placed under arrest for disorderly conduct after he loudly and repeatedly responded to the Deputies' commands that he exit the building with profane statements while inside the courthouse. The only reasonable inference to be drawn from this is that the Deputies arrested him for disorderly conduct.[11] Ollestad points to nothing that would make his arrest unreasonable—nonetheless intentionally discriminatory or caused by deliberate indifference to a known disability—

---

[11] Under Minnesota law, a person is guilty of disorderly conduct when he "engages in . . . offensive, obscene, or abusive language tending reasonably to arouse alarm, anger, or resentment in others," and knows, or has reason to know that such conduct "will, or will tend to, alarm, anger or disturb others or provoke an assault." Minn. Stat. § 609.72, subd. 1(3).

that would amount to an ADA violation. Accordingly, the Court dismisses his third claim.

### E.  Rehabilitation Act

Ollestad brings an analogous Rehabilitation Act claim against the City of Mora arguing that the City's failure to properly train the Deputies caused his disability-based rights. "The Rehabilitation Act is similar to the ADA" and was created to prevent disability discrimination in programs that receive federal funding. *Argenyi v. Creighton Univ.*, 703 F.3d 441, 448 (8th Cir. 2013) (citations omitted). However, like an ADA claim, a failure to train claim under the Rehabilitation Act requires a showing of intention or deliberate indifference. *Roberts*, 723 F.3d at 976. Even assuming the City of Mora is responsible for the training of Kanabec Sheriff's Deputies, *see* footnote 7, Ollestad makes almost no showing alleging the City of Mora provided insufficient training or did so with the intention or the deliberate indifference to those with disabilities such as Ollestad. This claim is also dismissed.

### F.  *Monell* and Failure to Train or Supervise

In his Fifth and Sixth claims, Mr. Ollestad asserts § 1983 claims against the individual officers for failure to train and for municipal liability on the part of the City of Mora for failure to train or supervise and for maintaining policies or customs that caused

the violation of his constitutional rights. Because these claims substantially overlap, the Court discusses them together.[12]

There are immediately apparent problems with Mr. Ollestad's failure-to-train or failure-to-supervise claim against the individual Deputies. A supervising officer can be held liable under § 1983 "if he directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996) (citation omitted). However, to adequately plead a failure to train or supervise claim, the plaintiff must sufficiently allege that the officer "was deliberately indifferent to or tacitly authorized the offending acts" and that they "had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Troupe v. Young*, 143 F.4th 955, 972 (8th Cir. 2025) (cleaned up). Ollestad fails to state such a claim against the Deputies because, as discussed above, he has not alleged any plausible violation of his constitutional rights. Nor has he alleged any facts demonstrating that any of the Deputies were deliberately indifferent to or tacitly authorized any other officer's

---

[12] Ollestad states that his fifth claim is brought against "all Defendants," but asserting this claim against the City of Mora renders his sixth claim at least partially superfluous. Further, he provides no allegations against the City within the section devoted to his fifth claim. The Court accordingly construes his fifth claim as one asserted against the Deputies only.

conduct or had notice of deficient training or supervision.[13] This is insufficient and Ollestad's fifth claim is dismissed.

Ollestad's § 1983 claim against the City of Mora for failure to train or supervise fails for similar reasons. "A [local government] can be liable under § 1983 if an 'action pursuant to official municipal policy of some nature caused a constitutional tort.'" *Watkins v. City of St. Louis*, 102 F.4th 947, 953 (8th Cir. 2024) (quoting *Bernini v. City of St. Paul*, 665 F.3d 997, 1007 (8th Cir. 2012)). To state a claim against a local government under § 1983, called a *Monell*[14] claim, the plaintiff must allege that the constitutional or statutory violation was caused by either (1) an official policy; (2) an unofficial custom; or (3) deliberate indifference to a failure to train or supervise. *Id.* (citing *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016)). For purposes of a *Monell* claim, a "policy" is "an official policy," meaning that an official with "final authority" over the relevant issue made a "deliberate choice of a guiding principle or procedure." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). To show that a local government "custom" exists for purposes of a *Monell* claim, the plaintiff must allege: (1) a continuing, widespread, persistent pattern of unconstitutional conduct by the municipality's employees; (2) policymaking officials' deliberate indifference to or

---

[13] It is unclear which of the Deputies Mr. Ollestad targets with this claim. While Ollestad specifies that he asserts it against all Defendants, he then suggests that only Deputy VanGorden had violated such a duty. (*See* Dkt. 1 at 30 ("Defendant Coleman and Defendant Kelsky, Defendant Vangordon [sic] immediate supervisor, had a duty to train and supervise them . . . .").) But because Ollestad fails to plausibly allege a constitutional violation, this distinction is ultimately meaningless.

[14] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

authorization of that conduct after notice; and (3) that the custom was the moving force behind the plaintiff's injury. *Id.*

Here, Ollestad alleges that the City of Mora has numerous unofficial customs that have caused his alleged unconstitutional arrest.[15] However, even assuming that Mr. Ollestad's conclusory allegations concerning the City's unofficial customs satisfy his obligation to plead their existence, his failure to allege any underlying constitutional violation means his *Monell* claim cannot go forward. *See Whitney v. City of St. Louis*, 887 F.3d 857, 861 (8th Cir. 2018) (stating that "absent a constitutional violation by a city employee, there can be no § 1983 or *Monell* liability for the City"). Accordingly, his sixth claim must also be dismissed.

### G. Substantive Due Process

Finally, Ollestad asserts a § 1983 claim against the Deputies for violating his Fourteenth Amendment substantive due process rights. Specifically, Ollestad argues that the Deputies' acts were a "brutal and inhumane abuse of official power" and were

---

[15] Those customs are "to permit its officers to aggressively and violently arrest any citizen at the first sign of possible noncompliance"; "ignore all its written policies regarding de-escalation, reasonable use of force, [and the] appropriate treatment of people"; "to regularly use excessive force when putting someone into handcuffs and to regularly, needlessly, and deliberately throw individuals to the ground in the process of doing so"; "to try and cover-up and justify excessive use of force incidents by: (1) falsely claiming the person had committed obstruction or resisting after the fact; and (2) ignoring their protocol for writing reports regarding the use of force, so that the team will not be alerted to investigate their excessive uses of force"; "to refuse to discipline its officers for misconduct and to refuse to ever find its officers have engaged in wrongdoing, in the face of obvious and repeated constitutional violations, which resulted in a foreseeable culture of police brutality and silence in the face of ongoing and repeated civil rights violations"; and "of encouraging, condoning, tolerating, and ratifying the unreasonable and excessive use of illegal seizures and excessive force on citizens." (Dkt. 1 at 32–34.)

"outrageous and conscience shocking." (Dkt. 1 at 35.) The substantive component of the Due Process Clause of the Fourteenth Amendment protects "the right to personal security, as an 'historic liberty interest.'" *Semler v. Ludeman*, No. 09-cv-0732 (ADM/SRN), 2010 WL 145275, at *25 (D. Minn. Jan. 8, 2010) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982)) (order adopting R&R). An individual's substantive due process rights "prevent[ ] the government from engaging in conduct that 'shocks the conscience' . . . or interferes with rights 'implicit in the concept of ordered liberty.'" *United States v. Salerno*, 481 U.S. 739, 746 (1987) (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952) and *Palko v. Connecticut*, 302 U.S. 319, 325–26 (1937)); *Karsjens v. Piper*, 845 F.3d 394, 408 (8th Cir. 2017) (same). "Only in the rare situation when the state action is 'truly egregious and extraordinary' will a substantive due process claim arise." *Strutton v. Meade*, 668 F.3d 549, 557 (8th Cir. 2012) (quoting *Chesterfield Dev. Corp. v. City of Chesterfield*, 963 F.2d 1102, 1104–05 (8th Cir. 1992)). As discussed above, even when viewing Mr. Ollestad's allegations and the other material properly before the Court in the light most favorable to Ollestad, the record shows that the officers used only the force reasonable under the circumstances to place him under arrest for disorderly conduct while he was violating the March 2024 administrative order and refusing to cooperate. Nothing about their conduct is egregious or extraordinary and, therefore, Ollestad fails to state a substantive due process claim. His sixth claim is accordingly dismissed.

* * *

Based on the above and its review of the video footage and audio recording, the Court concludes that Mr. Ollestad fails to sufficiently state a claim for relief, and the Court dismisses his Complaint with prejudice. *See Paisley Park Enters., Inc. v. Boxill*, 361 F. Supp. 3d 869, 880 n.7 (D. Minn. 2019) ("A district court, in its discretion, may dismiss a pleading for failure to state a claim with or without prejudice. . . . Dismissal with prejudice may be warranted if amending the pleading would be futile.") (citing *Orr v. Clements*, 688 F.3d 463, 465 (8th Cir. 2012) and *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 782 (8th Cir. 2009)).

The Court also denies Ollestad's Motion to Strike as moot. See *Rivera v. Sedgwick Claims Mgmt. Servs.*, No. 24-cv-3247 (LMP/SGE), 2025 WL 1866179, at *5 (D. Minn. July 7, 2025) ("Because the Court concludes that the complaint must be dismissed for failure to state a claim . . ., the Court will dismiss as moot [the plaintiff's] motions to strike [the defendant's] answer . . . .").

## IV.    ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss (Dkt. 14) is **GRANTED**;

2. Plaintiff Thomas Richard Ollestad's Complaint (Dkt. 1) is **DISMISSED with prejudice**; and

3. Plaintiff's Motion to Strike (Dkt. 21) is **DENIED as moot**.

**Let Judgment be entered accordingly.**

Date: November 18, 2025                    *s/Katherine Menendez*
                                          Katherine Menendez
                                          United States District Judge